## Case No. 10,407.

### OCEAN INS. CO v. SUN 'MUT. INS. CO.

[8 Ben. 272.] [1]

District Court, S. D. New York. Dec., 1875.[2]

RE-INSURANCE—INSURANCE ON CHARTER — PAROL EVIDENCE TO EXPLAIN WRITING—INFORMATION MATERIAL TO THE RISK.

1. By an agreement made between the O. Ins. Co., of Portland. Me., and the S. Mut. Ins. Co., of New York. the latter agreed to re-insure such risks. taken by the former, as the latter should endorse on an open policy to be issued by the latter to the former. The open policy was accordingly issued. On the 30th of January, 1864, the ship C. S. P., of which one M. was one-eighth owner. was in New York. and was on that day chartered for a voyage from New York to San Francisco, thence to Callao and the Chincha Islands for a cargo of guano, and thence to Hamburg or Rotterdam with such cargo. By this charter the ship was not required to carry cargo from New York to San Francisco. She was at that time under a previous charter, by which she was to carry a cargo of coal from New York to San Francisco. On the 23d of March, 1864, the president of the O. Ins. Co. wrote to the vice president of the S. Mut. Ins. Co., saying: "I enclose returns for registry as follows: $5.000 on ship C. S. P., to San Francisco and Chinchas—war; $5.000 on pc. of do—marine"; and in a postscript he added: "I also enclose an additional return for insurance on charter, primage and property per ship C. S. P. to San Francisco only." The returns enclosed were all dated that same day and read as follows: (1) "Enter on open policy of this Co., war risk only, $5,-000 on ship C. S. P. at and from New York to, at and from San Francisco and Callao to Chinchas. rate 3 per cent;" (2) "Enter on open policy of this Co., $5.000 on charter of ship C. S. P. at and from New York to. at and from San Francisco and Callao to Chinchas—rate 3 per cent;" (3) "Enter on open policy of this Co.. $6,550 on charter, $2.650 on primage and $1.500 on property, on board ship C. S. P., at and from New York to San Francisco, including war risk —rate 6 per cent." Entries were made on the open policy according to these returns. Separate policies had been issued by the O. Ins. Co. to M. covering these several risks. The ship sailed from New York. and, before reaching San Francisco. was lost near Buenos Ayres. The O. Ins. Co. paid to M. and the S. M. Ins. Co. repaid under the re-insurance the $5.000 insurance on the charter of the ship, mentioned in the second of the returns. Such repayment was made before May. 1866. In September, 1866. M. commenced a suit in the supreme court of Maine, on the policy issued to him by the O. Ins. Co., to recover the $6.550 on charter. $2.650 on primage and $1.500 on property, which he claimed to have been an insurance on the guano charter. The O. Ins. Co. defended the suit, denying that they had insured the guano charter, and they sent notice of the suit to the S. M. Ins. Co., which co-operated in the defence. On the trial of that suit the plaintiff offered parol evidence to show that the word "charter," in the application for the policy, and in the policy, was understood, at the time the insurance was effected, to mean the guano charter. When the decision of the court in Maine that such evidence was admissible was communicated by the O. Ins. Co. to the S. M. Ins. Co., the latter refused to co-operate further in the defence of that suit. The parol evidence being admitted in that suit, the

plaintiff recovered judgment against the O. Ins. Co.. and that company then brought this suit against the S. M. Ins. Co.. on the policy of re-insurance: *Held*, that, as the parol evidence which was admitted in the suit against the libellants, to establish that the charter intended to be insured by them was the guano charter. was not communicated by the libellants to the respondents before the effecting of the re-insurance, the recovery against the libellants was not binding on the respondents.

2. The language of the several returns sent by the libellants to the respondents. did not amount to notice of the existence of the guano charter.

3. There being two charters. one of them having the same termini as the voyage described in the policy. and the other of them covering that route and a farther continuing route. and there being no explanation between the parties as to which charter was meant to be covered by an insurance on "charter," the policy must be regarded as saying that the charter intended was the charter covering only the route of the voyage described in the policy.

4. The payment by the respondents of the $5,000 on the policy issued under the second of the returns did not constitute a recognition of their having effected insurance on the guano charter.

5. The information which it was shown that the libellants had when they applied for the re-insurance, as to the existence of the two charters of the vessel and their terms. was material to the risk to be assumed by the respondents and was not communicated to them.

6. The re-insurance made by the respondents was not upon the guano charter, and the libellants were not entitled to recover.

In admiralty.

Benedict, Taft & Benedict. for libellants.

Evarts, Southmayd & Choate, for respondents.

BLATCHFORD, District Judge. This is a libel filed by the Ocean Insurance Company, a marine insurance corporation, of Portland, Maine, against the Sun Mutual Insurance Company, a marine insurance corporation, of the city of New York, to recover upon a policy of insurance issued by the respondents to the libellants. The libel alleges, that, before the 20th of March. 1864. the libellants and the respondents entered into an agreement, that the respondents should, on request, reinsure the libellants, on risk taken by the libellants, on all such risks as the respondents should, from time to time, approve and endorse on an open policy to be made by the respondents; that the respondents made their open policy, whereby they insured the libellants upon the risks specified in the libel, which were approved by the respondents and endorsed on the policy; that the ship Charles S. Pennell, being in the port of New York, and George M. Melcher being the owner of one-eighth of said vessel, and being her master. and said vessel having been chartered on the 30th of January. 1864. to A. J. Schon & Co.. and J. D. Mutzenpecher, Sons, merchants and agents of Messrs. Henry. Witt & Shutte, Lima, agents of the supreme government of Peru and their consignees of guano in Germany, for a voyage

---

[1] [Reported by Robert D. Benedict, Esq.. and Benj. Lincoln Benedict, Esq., and here reprinted by permission.]

[2] [Reversed in Case No. 10.408. Decree of circuit court reversed by supreme court in 107 U. S. 485, 1 Sup. Ct. 582.]

on the high seas from New York to San Francisco, thence to Callao and the Chincha Islands, for a cargo of guano, and thence to Hamburg or Rotterdam with said cargo, said charter party being of the value of $52,400, and the primage thereon being of the value of $2,650, and said Melcher being interested in said charter and said primage, and being the owner of certain property on board of said ship, the libellants insured said Melcher, on the high seas, at and from New York to San Francisco, $6,550 on charter, meaning the said charter, $2,650 on primage, meaning the said primage, and also $1,500 on property on board, meaning said property, against the perils of the seas and other perils enumerated in said policy; that, thereupon, the libellants, on the 23rd of March, 1864, being interested in said charter, and said primage, and said property on board, and said insurance thereon, for the reimbursement of the libellants thereon, made an application to the respondents to enter upon said open policy, $6,550 on charter, $2,650 on primage, and $1,500 on property on board said ship, at and from New York to San Francisco aforesaid, including war risk, being the same risk insured by the libellants; and that the respondents, on the receipt of said application, approved the same, and endorsed the same on said open policy, at a premium which was paid. The libel then avers the loss of the vessel, while on said voyage, by the perils of the seas, and before she reached San Francisco; that thereby said Melcher wholly lost said charter, and his said interest therein, and said primage, and said property, whereby the libellants, as such insurers, became liable to pay the said several sums, amounting to $10,700, to said Melcher; that, on notice of said loss to the libellants, they gave notice thereof to the respondents; that the respondents then declared that payment of the loss should be refused, and it was accordingly refused, and an action was thereafter brought by said Melcher in the supreme judicial court of Maine, against the libellants, to recover the same, and such proceedings were thereupon had, that said Melcher, on the 7th of December, 1872, recovered against the libellants, on the policy given by them, the sum of $9,200 and interest from April 28th, 1865, of which recovery the libellants paid, before judgment was entered, $4,234.29, and, on June 28th, 1873, judgment was duly entered for the balance of said recovery, $9,473.71, and costs taxed at $574.17; that, by reason of the premises, the libellants became liable to pay to said Melcher said loss and costs so recovered, and the respondents became liable, under said open policy, and said loss and said judgment, to pay said loss and costs to the libellants, with interest, and also the further sum of $1,164.70 counsel fees, costs and expenses of said suit, paid by the libellants, other than the costs above mentioned, with interest thereon from the time of such payment, July 23rd, 1873; and that

due proof of loss, costs, expenses and counsel fees, and of interest, was furnished to the respondents more than 30 days before the commencement of this action, and payment was demanded of the respondents, and refused.

The answer sets up various defences, but, as one of them seems to be conclusively established, and that the main one, and one which goes to the foundation of the action, it will be necessary to refer to only that one. The answer avers, that, at the time of the application by the libellants to the respondents for the reinsurance mentioned in the answer, the respondents had not, nor had any of its officers or agents, heard of any charter of the said ship for a voyage on the high seas from New York to San Francisco, thence to Callao and the Chincha Islands for a cargo of guano, and thence to Hamburg or Rotterdam with said cargo, nor did either of them have any intimation of any such charter until after the loss of said ship; that, at the time of such application for reinsurance, the said ship was lying in the port of New York, bound on a voyage to San Francisco, and under a charter to carry a cargo of coal and other merchandise from New York to San Francisco; that she was then nearly or entirely loaded and ready to sail upon that voyage, and upon no other, as was well known to the respondents and to other persons having dealings with said ship; that, on the 23rd of March, 1864, the libellants sent to the respondents an application in the following words: "To the Sun Mutual Insurance Company: Enter on open policy of this Co. 51,564, $6,550 on charter, $2,650 on primage, $1,500 on property on board ship Chas. S. Pennell, at and from New York to San Francisco, including war risk, rate 6 per cent;" that the respondents, understanding said application to refer to the charter of said ship on her voyage from New York to San Francisco, on which she was then bound, and under which charter she had been then nearly or completely loaded with merchandise to be carried to San Francisco, and not being aware or having heard of any other charter of said vessel, thereupon endorsed the same on said open policy; that, after the happening of the disaster to said ship, said Melcher claimed that the policy issued to him by the libellants related to the guano charter and the primage on the charter money mentioned therein, and that he was entitled to recover the said sums of $6,550 and $2,650 from the libellants, for his interest in said last mentioned charter and primage; that such claim was disputed and refused by the libellants, on the express ground that said policy issued by the libellants had no application to the guano charter, but referred and was intended to apply only to the charter under which the vessel was employed to carry said cargo of coal and other merchandise from New York to San Francisco; that, the libellants having, in

April, 1865, given to the respondents notice of the making of such claim, the respondents acquiesced in such dispute and refusal of the same, and did, so far as the respondents were concerned, refuse to recognize said claim as falling within the terms of said re-insurance policy; that thereupon said action was brought by said Melcher against the libellants, and said judgment was recovered; that said judgment was given against the libellants mainly upon the ground that one Sawyer, who was the said Melcher's agent for effecting said insurance and other insurance upon his interest in said ship, applied to the libellants for such insurance of $6,-550 and $2,650, and, at the time of such application, produced and exhibited to the president of the libellants, to whom personally such application was made, a letter from said Melcher to said Sawyer, requesting the latter to procure insurance of said sums of $6,550 and $2,650 upon said guano charter and the primage of the same; and that, upon the strength of evidence of those facts, and of such evidence alone, the insurance made by the libellants was held to be applicable to the guano charter; that said letter was never exhibited or communicated to the respondents, or to any of its officers or agents, by the libellants, nor did the respondents ever know or hear of its existence, or of any purpose or intention on the part of the said Melcher or his agent, or on the part of the libellants, to make the policy issued by the libellants applicable to the guano charter, until about the month of January, 1872, when it was brought to the attention of the respondents by their counsel, after an examination by him of the proceedings on the trial of the action of Melcher against the libellants; that the respondents immediately notified the libellants, through their counsel, of the refusal of the respondents to be bound by any judgment rendered in said action, which should be based on the fact of the exhibition of said letter by said Sawyer to the president of the libellants, or upon any thing which took place between the president and said Sawyer when the original insurance was applied for by the latter, inasmuch as none of said matters were communicated to the respondents at the time of the application for said re-insurance; that the respondents, at the time they made such re-insurance, had not, nor had any of their officers, any knowledge or information of any matter or thing in regard to said original insurance, or of its application to any particular subject-matter, other than the notice from the libellants to the respondents, above set forth, requesting the latter to enter the said sums of $6,550, $2,650 and $1,500 upon the said re-insurance policy, and had no knowledge or information of any fact, matter or thing which could operate to make the said insurance, so far as concerned the said $6,550 and $2,650, applicable to any other subject-matter than the said charter under which the said ship was em-ployed to carry a cargo of coal and other merchandise from New York to San Francisco; and that, if the respondents had had knowledge of any such fact, matter or thing, and, especially, if they had been aware of any purpose to make the said insurance applicable to the guano charter, they would have declined to become the libellants' re-insurer therefor, for the reasons, among others, that it would have involved a large over-insurance upon or in respect of the said Melcher's interest in the said ship, and that the accumulation of so large an amount of insurance thereon (making nearly three times its value) would have been contrary to the rules and principles which govern prudent underwriters in making insurances, and would have offered strong inducements to said Melcher, supposing him to be subject to pecuniary temptation, to cast the said ship away.

I regard it as clearly established that the respondents did not insure the guano charter. The transactions between the parties were effected wholly by correspondence. On the 23rd of March, 1864, the president of the libellants wrote a letter to the vice-president of the respondents, saying: "I also enclose returns, per registry, as follows: $5,-000 on ship C. S. Pennell to San Francisco and Chinchas, war; $5,000 on pc. of do. marine." Then, in a postscript to the letter, he says: "P. S.—I also enclose an additional return for insurance on charter, primage and property, per ship C. S. Pennell to San Francisco only." The returns enclosed were these (all of them dated March 23rd, 1864): (1) "Enter on open policy of this company 51,564, war risk only, $5,000 on ship Chas. S. Pennell, at and from New York to, at and from San Francisco and Callao to Chinchas—rate 3 per cent." (2) "Enter on open policy of this company 51,564, $5,000 on charter of ship Chas. S. Pennell. at and from New York to, at and from San Francisco and Callao to Chinchas—rate 3 per cent." (3) "Enter on open policy of this company 51,-564, $6,550 on charter, $2,650 on primage, and $1,500 on property on board ship Charles S. Pennell, at and from New York to San Francisco, including war risk—rate 6 per cent." It is the insurance made on the last-mentioned return that is the subject of the present suit. The respondents received no information from the libellants as to what the charter intended was, except such as is contained in the three returns above set forth and in the letter enclosing them.

From the policy issued by the libellants to Melcher, on the 23rd of March, 1864, it appears that the insurance made by them was described in that policy as "$6,550 on charter, $2,650 on primage, and also $1,500 on property on board ship Chas. S. Pennell, at and from New York to San Francisco." From the record of the proceedings in the suit brought against the libellants by Melcher, it appears that he alleged that the li-

bellants, by their policy, insured the guano charter. To prove this, he introduced as a witness one Sawyer, who, as the agent of Melcher, personally effected the insurance for Melcher at the office of the libellants. He did so in pursuance of a letter which he had then just received from Melcher, dated New York, March 20th, 1864. In that letter Melcher said: "I want you to insure on my part of the ship as follows: Say war risk out to San Francisco, ship, $5,000; charter to San Francisco, $26,500, 1-8, $3,300: primage on same, $1,325; homeward charter from Chinchas, insure out, say 1,750 tons, at $4, $7,000; at current rate of exchange, $52,400; my 1-8, $6,550; primage on same, $2,650; chronometers, $500; and on our own effects, clothing, &c., $1,000; making, total, $19,425." The written application which Sawyer signed on the libellants' book was in these words: "I wish for Geo. M. Melcher $6,550 on charter and $2,650 on primage, and $1,500 on property on board ship Charles S. Pennell, at and from New York to San Francisco, including war risk." But Sawyer testified as follows on that trial: "Q. State whether or not you exhibited that letter to the president of the company at the time you applied for insurance. A. I did. Q. At whose request did you exhibit it to him? A. At his own. He asked me to hand him the letter. Q. Did he take it and examine it? A. He took it, and, I suppose, examined it. He made some comments on it. Q. What time in the day did you receive the letter? A. I think it came in the noon train. I got it about 2 o'clock in the afternoon and went to the Ocean Insurance Company the next morning at 10 o'clock. Q. State all that was said and done between yourself and the officers of this company at the time, in relation to this policy of insurance and the subject matter insured. (Defendant objects to both form and substance. Admitted, subject to objection.) A. After effecting an insurance on the ship, Mr. Woodbury" (the president) "asked me if I could give him any other insurance. I told him I had received a letter from Capt. Melcher, requesting me to insure a guano charter. He said, 'Let me see the letter.' I passed it over the desk to him. He took it in his hands and says: '1,750 tons; ain't that a large amount to insure on that ship?' I told him I had insured the ship in his office when she carried 1,800 tons in her. He said, 'Homeward charter, insure out—why didn't the captain ask you to insure all the way round, as he had the ship?' My answer was, before the ship got through, if the war closed, he could effect the insurance cheaper. I was to be advised by Capt. Melcher on his arrival at San Francisco, and agreed with him to insure in his office if he took it. . He made some other comments. Among others he said, 'what did Foye take the New York insurance for?' I told him 6 per cent. with the scrip earnings back. After some little talk he told me he

would take this at 5 1-2, and I was going to leave the office, he said: 'It will be necessary to make application,' or sign one. Wright copied an application on to his book, and I signed it without reading it. I don't know what I signed. It was mere form, I suppose. Q. Did he make any other comment in relation to the statement in the letter you showed him, or figures? A. He asked me what the captain rated the pound at. I told him I thought about $8. He took a pen and figured over on the desk and said he thought it was about that himself. Q. Did he read any part of the letter about pounds when he made those figures? (Objected to by defendant. Admitted, subject to objection.) A. He did. Q. Do you hold in your hand the letter you carried to Mr. Woodbury? A. I do. Q. State what part he read when he asked you how the captain figured the pound. (Objected to. Admitted, subject to objection.) A. I cannot tell you what part he read. He said, 'say 1750 tons, at $7,000.' Then he asked me what the captain cast this insurance for at the pound. I cannot state all that was said—six years have passed. I am giving the subject matter as well as I can. Q. Had he just been examining the letter when he made that statement? A. He had. I think he held the letter in his hands or on the desk when he made the figures. Q. What charter did you tell Woodbury you wanted insured at this time? A. A guano charter. Q. What description did you give him of the charter? A. I told him the captain was chartered for guano. He says, 'I know it. Pennell has been talking with me about it this afternoon.' Q. Did you state what voyage the guano charter was for? A. I don't know that I did, for we had stated the voyage a few minutes before, in effecting the insurance on the ship. I had effected an insurance on the same route a few minutes before; the same voyage for which this guano charter was for. Q. Did you apply for any insurance to the Ocean Ins. Co. upon any other charter or freight, except the guano charter? A. I did not at that time. Q. Upon what voyage had you obtained insurance upon the ship at the Ocean Ins. Co.'s office at this same time? A. New York to San Francisco, with liberties of Callao, to the Chinchas, and from thence to a port in Europe. Q. Where did the conversation you have related take place? A. In the Ocean Ins. Co.'s office, on Exchange street. Three or four days after that I went for the policies. Q. Whom did you see there? A. Mr. Wright. I think no one else. He is secretary of the Ocean Ins. Co. Q. What was said in relation to this charter? A. I opened the policy and read '$6,550 on charter.' I says to Wright, 'You have left out the word guano.' Said he, 'That don't make any difference. The insurance you effected with Foye was freight; this is charter.' I said to him, 'Hadn't you rather have charter than

freight?' 'No,' said he, 'if I get freight and the vessel is wrecked, the freight helps forward itself, whereas charter is a total loss.' Q. Have you stated all the first conversation in relation to what Woodbury said to you about effecting this insurance? A. He said a good deal in relation to not insuring the round voyage. I think I told him I should not insure her guano charter with a war risk. He wanted to know why. I told him the Southern Confederacy privateers did not burn guano ships. He referred me to one instance where it had been done. Q. State what else you recollect was said in relation to that subject matter of insurance at Woodbury's office, at the first conversation, if anything. (Defendant objects to both form and substance.) A. I told him I would put implicit confidence in his insuring me; told him I had made a mistake in insuring the last one, and I wanted this guano charter insured out, and I wanted no mistake about it. He gave me to understand there should be none." All the foregoing testimony of Sawyer was seasonably objected to by the counsel for the defendants in that suit, and was admitted by the court subject to objection. After this, and the other evidence on the trial had been introduced, the judge before whom the cause was tried, being of opinion that it was desirable, before proceeding further in the cause, to take the opinion of the full court upon the question of the admissibility of the evidence which had been put in by the plaintiff subject to the defendants' objection, the case was withdrawn from the jury, and reported to the court for their opinion, as to whether any of said evidence was admissible, and, if any, what portion thereof, and, after the determination of those questions, the cause to stand for trial, if either party should so desire. The questions raised were argued before the full court. The decision is reported in 59 Me. 217. The court held that insurance of the charter meant insurance of the freight to be carried under the charter. As the vessel, at the time she was lost, was sailing under two charters, one requiring her to carry coal and other merchandise from New York to San Francisco, and the other requiring her to carry a cargo of guano from the Chincha Islands to Hamburg or Rotterdam, and, as she was lost on the outward voyage, the court considered the question to be whether extrinsic evidence was admissible to show which of the two charters was the one insured by the defendants in that suit. The plaintiff having offered to prove that it was the guano charter, the defendants resisted, on the ground that the words in the policy, "at and from New York to San Francisco," were descriptive of the charter insured, and that extrinsic evidence that any other charter was intended was not admissible, as its effect would be to vary and not explain the policy. The court held that the words "at and from New York to San

Francisco" did not describe any portion of the property insured, but described, simply, the voyage during which the risk was to continue, and did not describe both the voyage and the charter; that, as a charter was insured by the policy, and two charters were shown to exist, either of which would answer the call in the policy, the case was one of a latent ambiguity, to remove which extrinsic evidence might be resorted to; and that, therefore, the evidence offered by the plaintiff was admissible for that purpose, and the action must stand for trial. The second trial took place, and the same evidence of Sawyer, that is above detailed, was given; and it was proved that the vessel sailed from New York for San Francisco, loaded with a general cargo for San Francisco, with a charter from New York to San Francisco, and that Melcher's interest under that charter was covered by other previous insurance. The case was then withdrawn from the jury and submitted to the court, to enter such judgment as the law and the evidence should direct. The court held (60 Me. 77) that the evidence satisfactorily showed that the policy sued on was intended to cover the guano charter; that the voyage covered by that charter was a continuous one from New York to San Francisco, thence to Callao, thence to the Chincha Islands, there to load with guano, and thence to Hamburg or Rotterdam; that the insurance effected by the policy sued on was on so much of said voyage as was to begin at New York and terminate at San Francisco; that, as, under the charter, no freight was carried between New York and San Francisco, and none between San Francisco and the Chincha Islands, the policy, to give any effect to it, must be regarded as one upon the freight which would be carried during the whole voyage, if the loss should occur between New York and San Francisco; that, as the vessel had started on her chartered voyage, Melcher's interest in the chartered freight had commenced, and was an insurable interest, as freight; that the fact that there was a charter between Melcher and others for a voyage from New York to San Francisco, and an insurance thereon by another company, constituted no defence, unless the liability of the defendants was thereby increased or injuriously affected; that the defendants knew that there was to be freight from New York to San Francisco, and that the same was insured, and, with such knowledge, insured the risk for a portion of the voyage covered by the guano charter; and that they were liable for the $9,200 insurance on charter and primage. Judgment was given accordingly.

On the trial of the present action, the policy which the libellants issued on the 23rd of March, 1864, on Melcher's interest in the vessel, and which Sawyer, in his testimony in the suit in Maine, described as an insurance for the voyage covered by the guano char-

ter, has been put in evidence. That policy insures Melcher "$3,000 on ship Chas. S. Pennell, at and from New York to, at and from San Francisco and Chinchas, with usual liberties of Callao, to her port of advice and discharge in Europe."

The evidence in the present suit shows that the respondents co-operated with the libellants in resisting the claim made against the libellants by Melcher in the suit in Maine, until it appeared, by the decision to admit the parol evidence offered by Melcher, that the libellants were to be held liable, by means of such evidence, for an insurance of the guano charter, but that, from and after that time, the respondents asserted to the libellants that the respondents were not bound by anything which was not communicated to them when they insured the libellants, and that the respondents would not admit that they could be held to have insured the guano charter. On the 16th of January, 1872, as soon as the court had decided that the parol evidence was admissible, the attorneys for the libellants sent to the respondents a copy of the opinion of the court. The respondents submitted that opinion to their counsel and received his written views thereon, a copy of which they sent to the libellants' attorneys on the 29th of January, 1872, in a letter of that date, which said: "If the effect of the admission of the evidence of the plaintiff in the suit against the Ocean Insurance Co. will be to hold them liable on a risk different from that described in and re-insured under our policy to them, we, not being re-insurers of such risk, of course have no interest." The attitude then assumed by the respondents was always subsequently maintained.

The respondents insured a charter and primage for a voyage from New York to San Francisco. What charter? It is not shown that any of the information which Sawyer communicated to the libellants was made known to the respondents, nor that the latter knew of the guano charter, or of the insurance made by the libellants on Melcher's interest in the vessel for the voyage covered by the guano charter. But it is shown that the ship sailed from New York under a charter from New York to San Francisco. That charter is in evidence. It was made a month before the guano charter was made. It charters the vessel for a voyage from New York to San Francisco for a full cargo of merchandise, no cargo to be received on board during the voyage without the consent in writing of the charterers, the charter money to be $26,500 (the sum named in Melcher's letter to Sawyer as "charter to San Francisco"), payable on discharge of the cargo at San Francisco. It is also shown that the respondents, a few days before they insured the libellants on the risk in question, entered on an open policy issued by them to a customer, two risks of merchandise by the ship Charles S. Pennell from New York to San Francisco, and that

the vessel was advertised by such charterers as a general ship for a voyage from New York to San Francisco, in a newspaper which was taken by the respondents, and otherwise, and that she was loading with cargo for some time at New York for such voyage. It is also shown by abundant evidence, in the testimony of experienced marine underwriters, that, in an application for insurance "on charter, at and from New York to San Francisco," where there are two charters, and one of them is over a part of the route of the other, it is material to the risk that the applicant should disclose the existence and termini of the two charters, and the fact that the insurance applied for is intended to cover the risk of the charter for the longer route over the shorter route. The reasons which the witnesses give for this conclusion are plain and satisfactory. It is worth a higher rate of premium to take the risk of a given amount on the guano charter over the route from New York to San Francisco than it is to take the risk of the same amount on the charter from New York to San Francisco over the same route, because, in the former insurance, in case of a disaster, there would be no possibility of any salvage by forwarding cargo to its destination by another vessel, whereas, in the latter insurance, there might be such salvage, which, if the disaster occurred near the port of destination, would be large. Moreover, such disclosure in respect to the two charters is material to enable the insurer to determine whether he will insure at all or not. One of the expert witnesses expresses his view as follows: "If the insurance were applied for without such disclosure, I should regard it as an application to insure simply the freight money dependent upon the delivery of cargo at San Francisco, whilst, with the disclosure, I should understand it to be a proposition to make an insurance which I should understand to be a wager policy, as there would be no interest to be transferred to the underwriter, or from which he could, by any possibility, derive salvage. As an underwriter, I believe such an insurance as that last mentioned to have an immoral tendency, as offering to a master a temptation to lose his vessel on such voyage, and I invariably, as an underwriter, refuse such an insurance. In case of a total loss, the insured would receive pay from the insurer not only for the whole freight depending on the passage from New York to San Francisco, but for the expected freight, and that without the very considerable outlay which would have to be made in undertaking and performing the further voyage." It is also shown, that, under the charter for the voyage from New York to San Francisco, no consent was given to carry other cargo than that put on board by the charterers, and that the vessel sailed with a full cargo under that charter.

An insurance upon "charter" is an insurance of the risk of losing the freight to be

carried under a charter. Where there are two charters, one of them having the same termini as the voyage described in the policy, and the other covering that route and a further continuing route, and the policy merely insures "charter" (which is the present case), and there is no explanation between the parties at the time of effecting the insurance, as to which of the two charters is intended, the policy must be regarded as saying that the charter intended is a charter covering only the route of the voyage described in the policy. This would have been so in the suit brought against the libellants in Maine but for the parol evidence that was admitted. But for that, Melcher could not have made out the policy issued by the libellants to him to be a policy on the guano charter, and it would, on its face, have been a policy on the charter that was co-terminous with the voyage described in the policy.

What parol evidence is there, in the present case, as against the respondents, to show that they insured the guano charter? The libel alleges, that, the vessel having been chartered under the guano charter, and Melcher being interested in said charter and in the primage thereon, the libellants insured him on said charter, and on said primage, at and from New York to San Francisco, and that the respondents reinsured the same risk so insured by the libellants. It also alleges, that the libellants, in insuring "charter," meant the guano charter, and in insuring "primage" meant the primage on the guano charter. These allegations mean, and the evidence shows, that the libellants knew, when they insured Melcher, that there was a guano charter and what its terms were. The evidence also shows that the libellants knew, when they insured Melcher, and when they applied to the respondents for insurance, that there was also a charter from New York to San Francisco, under which the vessel was to carry cargo and earn freight, and that the guano charter covered the passage from New York to San Francisco, as well as the route thence to the Chinchas and beyond the Chinchas. All this appears on the face of the letter from Melcher to Sawyer, which was exhibited to the libellants before they insured Melcher on charter and primage. It also appears, from the evidence given in the suit in Maine, that the libellants, in insuring Melcher on charter and primage, expressly agreed, having the knowledge above mentioned, to insure the guano charter, and meant, by the insurance they made, an insurance on the guano charter. But, knowledge of the existence of the guano charter, and of the letter from Melcher to Sawyer, and of the other facts above mentioned as known to the libellants, is not shown to have been possessed by the respondents. or to have been communicated to them by the libellants. It was the duty of the libellants to make known to the respondents, in applying for the reinsurance, all the information possessed by the libellants that was material to the risk.

The information so possessed by the libellants, and not communicated to the respondents, is shown, by the evidence, to have been material to the risk. But the libellants communicated nothing, except that they desired an insurance on "charter" and "primage," "at and from New York to San Francisco," leaving it to be inferred that the charter to be insured was co-terminous with the voyage stated.

The libellants, at the same time that they applied to the respondents for insurance on charter and primage, at and from New York to San Francisco, applied to them, as before mentioned, to take a war risk only on the same vessel of $5,000, and a separate marine risk on charter of the same vessel of $5,000, "at and from New York, to at and from San Francisco and Callao to Chinchas;" and the respondents insured those risks. It is urged, on the part of the libellants, that the written applications made to the respondents for these two risks informed them of the guano charter, and informed them sufficiently, that the insurance desired in the third application was an insurance on the guano charter. But, the information conveyed by the first and second applications was only to the effect that the vessel was going further than to San Francisco, and was, after leaving San Francisco, going to Callao and the Chinchas, and was to be under charter from New York, on such voyage, as far as the Chinchas. Those applications conveyed no information that the charter for any route beyond San Francisco was a charter commencing at New York, or that, while it was a different charter from the one under which the vessel was carrying cargo to San Francisco, the two charters covered, both of them, the passage between New York and San Francisco, with cargo to be carried and freight to be earned under the one for that passage, and no cargo to be carried and no freight to be earned under the other for that part of the passage, and that there was a charter covering the carriage of a cargo from the Chinchas to Europe, and that the voyage for the earning of the freight for such carriage was a voyage commencing at New York. No such information was communicated to the respondents, either by those applications, or by any of the letters written by the libellants to the respondents, or otherwise; nor was there anything in those applications. or in the letters, to put the respondents on inquiry. The information not disclosed is shown to have been material to the risk.

It is shown that the respondents paid to the libellants, in discharge of the insurance which they made in favor of the libellants, of $5,000 marine risk on "charter" of the ship, "at and from New York to, at and from San Francisco and Callao to Chinchas," the sum of $2,500 in October, 1865, and the further sum of $2,500 in May, 1866. It is strongly urged by the libellants that the fact of this payment is evidence that the respondents knew that, in insuring "charter," in the two insurances

made on "charter," March 23rd, 1864, they were insuring the guano charter. But, the suit in Maine against the libellants, brought by Melcher on their insurance of "charter" and primage, "at and from New York to San Francisco," was not commenced until September, 1866; and it does not appear that the respondents before that time had any information that Melcher claimed that such insurance covered the guano charter, or that the respondents had before that time heard of the guano charter. As there was not in the insurance by the respondents of $5,000 on charter "at and from New York to, at and from San Francisco and Callao to Chinchas," any conscious insurance of a charter such as the guano charter was, in view of the other charter from New York to San Francisco, so there was not in the payment of such $5,000, at the time and under the circumstances stated, any conscious recognition of an insurance on such a charter. From the time the suit in Maine was brought by Melcher, setting up that the charter insured by the libellants was the guano charter, the respondents have always contended to the contrary, and have always contended, also, that the guano charter was never insured by the respondents.

The insurance sought to be established in this case is one, on the evidence, of such a character as to require the fullest proof that the underwriters made it with a clear understanding of all the facts and circumstances attending the vessel, and her employment and her voyage, and of the liability they were assuming. The face of the policy imports no such insurance and no insurance of a charter extending beyond San Francisco. Where, as in the case of the insurance on charter by the libellants for Melcher, the insurers assume the risk with a clear knowledge of all the facts that are material to the risk, and thus with freedom of choice to accept or reject the risk, and with the ability to fix and exact an adequate premium, the insurance may properly be held to be binding, if the interest insured be an insurable interest. But such clear knowledge and freedom of choice are indispensable, for the system of insurance sought to be upheld in this case is one which would admit of several charters, each of which might include the passage from New York to San Francisco and each of which might be separately insured, while the vessel would really be earning freight, in carrying cargo from New York to San Francisco, under only one charter. Insurance on "charter" "at and from New York to San Francisco" would cover each one of the charters, and the real interest at risk between New York and San Francisco would be largely over-insured, under the guise of insuring the transit between those two places, as a part of a transit from New York, by the way of San Francisco, to places beyond. The evidence in this case shows that such a system of insurance is one that would not be adopted by underwriters generally,

and that no such insurance would be made or acknowledged, unless entered upon with full knowledge that it was such an insurance.

It results, from these considerations, that the libel must be dismissed, with costs.

[NOTE. On appeal to the circuit court the decree of this court was reversed, and a decree entered in favor of libelant. Case No. 10,408. Subsequently an appeal was taken to the supreme court, where the decree of the circuit court was reversed, and the cause remanded, with directions to enter a decree dismissing the libel. 107 U. S. 485, 1 Sup. Ct. 582.]